**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

D. A., et al.,                                    *
                                                  *
                         Plaintiffs,              *
                                                  *
        v.                                        *            **WGC-03-CV-3629**
                                                  *
                                                  *
JERRY D. WEAST, et al.                            *
                                                  *
                         Defendants.              *
                                                  *

**MEMORANDUM OPINION**

This action, brought pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq.*, the Rehabilitation Act of 1973, 29 U.S.C. § 794, and the Civil Rights Act, 42 U.S.C. § 1983, has been referred to the undersigned for all proceedings by consent of the parties (Docket No. 18). The parties have filed cross motions for summary judgment (Docket Nos. 25 and 28) and replies (Docket Nos. 41 and 43). The issues have been fully briefed and are ready for disposition. No hearing is deemed necessary. *See* Local Rule 105.6 (D. Md.). For the reasons set forth below, summary judgment will be awarded in favor of Defendants and against Plaintiffs.

**I.  BACKGROUND**

It is uncontested that D.A. is a child with educational disabilities who is entitled to special education and related services under IDEA. Compl. ¶ 6; Answer ¶ 6. This case stems from a complaint filed by Plaintiffs, S. and R. A. ("the Parents") in their own right and on behalf of D.A., against the Montgomery County Board of Education and Superintendent Jerry D. Weast, Montgomery County Public Schools ("MCPS") for denial of a free appropriate public

1

education ("FAPE") for the 2002-2003 school year due to procedural violations in the development of D.A.'s July 26, 2002 Individualized Education Program.

**A.      *Facts***

D.A. was born on January 1, 1989, Compl. ¶ 5; Answer¶ 5, and is sixteen years old.  D.A. began her schooling in a regular elementary MCPS.  Her transition to middle school however was not smooth nor successful.  D.A. began to falter academically and emotionally while attending Robert Frost Middle School.  The Parents began considering other options and decided to enroll D.A. in private school.  D.A. was initially enrolled at a boarding school for a period of time.  That enrollment was unsuccessful because the school was not a special needs program. The Parents thereafter enrolled D.A. at Parkmont School, a private school in the District of Columbia.  That enrollment was successful for a little while but Parkmont School realized it lacked the resources to deal with D.A.'s educational or emotional needs.  Hearing Tr., Vol. I, 34:22 - 35:13.

The Parents recognized D.A. needed a more intensive placement.  They looked at private options as well as free public education from MCPS.  Because the Parents had exhausted all financial resources, they elected to pursue a more intensive placement with MCPS.  Hearing Tr., Vol. I, 35:13 - 22.

On July 26, 2002 an Individualized Education Program ("IEP") meeting was convened by MCPS' Central Office IEP team.  The Parents and Ellen Dye, Ph.D., a private psychologist who has treated D.A. since November 2000, attended the meeting.  George R. Moore, MCPS representative/chair and Billie Stephenson, Case Manager, were among the MCPS personnel in attendance.

On August 5, 2002, Mr. Moore provided the Parents the recommendations of the IEP team as recorded on the IEP.  *See* Parent Ex. 1.  The IEP team found D.A. was eligible for special education based on her emotional disturbance and learning disability.  The IEP team determined the Least Restrictive Environment for D.A. is a separate special education day school.  Mark Twain School was identified as an interim program.  The IEP team would refer D.A. to the John L. Gildner Regional Institute for Children and Adolescents ("RICA") for possible admission, as well as to several nonpublic schools.

In an undated letter Cindy Baker, Admissions Coordinator at RICA, notified the Parents that D.A. will be admitted to RICA Residence on September 3, 2002 at 1:00 pm.  *See* Parent Ex. 2.  On that same day, Mrs. A. initialed MCPS Form 336-51, indicating her approval of the IEP.  *See* MCPS Ex. 1 (Page 13 of 14).

In November 2002 the Parents received a billing notice from the Maryland State Department of Health and Mental Hygiene ("DHMH") for the residential component of D.A.'s enrollment at RICA.  The cost of D.A.'s residential placement is $571 per day.

Upon receiving this billing notice, Mrs. A. made multiple telephone calls to MCPS, including to Ms. Stephenson, D.A.'s case manager.  Ms. Stephenson was surprised that such a notice was sent.  Hearing Tr., Vol. I, 95:3 - 15.

Mrs. A. raised her concerns about the DHMH bill to Dr. Jerry Weast in a November 22, 2002 letter.  *See* Parent Ex. 3.  Dr. Weast responded to the Parents in a December 23, 2002 letter.

> This is in response to your letter of Friday, November 22, 2002, regarding your daughter's placement in the Regional Institute for Children and Adolescents (RICA) program.  I understand that this has been a very difficult situation for you.  As you state in your letter, the clinical and residential program at RICA is operated and provided by the State of Maryland Department of Health and Mental Hygiene

(DHMH) and the school program is operated by Montgomery County Public Schools (MCPS). It is my understanding that you are in the process of addressing your concerns about your financial obligations with the appropriate agency representatives within DHMH but that the situation has not been fully resolved at this time.

By copy of this letter and your letter of November 22, 2002, to me, I am requesting that the staff at RICA review the procedures currently in use with respect to admitting children into the residential program and accessing appropriate funding sources for this program. Hopefully, this will prevent possible confusion in the future with other families experiencing the same or similar circumstances.

Thank you for bringing your concerns to my attention. If you have any questions or need additional information, please call Dr. Suzanne V. Speicher, director, Division of Placement and Assessment Services, at [number listed].

Parent Ex. 4.

## B.    *Administrative History*

On March 10, 2003, the Parents requested a due process hearing. The Parents asked that the hearing not be scheduled before May 27, 2003 to permit them time to schedule expert witnesses. Simultaneously, the Parents requested mediation. In a March 20, 2003 letter, Dorothy J. Jackson, Acting Director, Department of Special Education, responded and wrote in part:

The Division of Equity Assurance and Compliance (DEAC) received your request for mediation on behalf of your daughter, [D.A.], on March 10, 2003. After further review, Montgomery County Public Schools (MCPS) is respectfully declining to mediate because your issues are not special education issues. Rather, your concerns should be addressed to the Maryland State Mental Health Administration (MHA). It is my understanding that you have already filed an appeal with MHA. We anticipate continuing to work with you to reach a resolution in this case. By copy of this letter, I am notifying the Office of Administrative Hearings that MCPS will decline to mediate.

MCPS Ex. 4.

In a March 24, 2003 response, Mrs. A. expressed her surprise that the Office of Special

Education declined the Parents' mediation request.  Mrs. A.'s letter states in pertinent part:

> The basis of the request is that she was improperly placed and we
> were given improper, incomplete and false information at our IEP
> meeting which has caused us to be in a position of extreme financial
> obligation, after the fact.  The impression we were given by MCPS
> staff was that residential was what was hoped RICA would enroll her
> for but that only RICA could make that determination.  Evidentially,
> MCPS could have placed her residential, although maybe not at
> RICA.  We were never informed that part of RICA was a MD State
> Psychiatric Hospital, nor of the potential tremendous costs involved.
> If this does not fall under the auspices of special ed and MCPS
> responsibility, I am not sure what does!

Parent Ex. 5.

On June 3 and 10, 2003, an Administrative Law Judge ("ALJ") convened a hearing[1] to

determine "whether the Child was denied a Free Appropriate Public Education because of

procedural violations in the development of the Child's July 26, 2002 Individualized Education

Program."  ALJ's Decision, at 2.  On July 1, 2003, the ALJ issued her decision, concluding, as a

matter of law, that the Child was not denied a FAPE because of procedural violations in the

development of the Child's July 26, 2002 IEP.  *See* ALJ's Decision, at 14.   Having exhausted all

administrative remedies, this action constitutes the next step in pursuit of Plaintiffs' claim.

## II.  STANDARD OF REVIEW

*A.     Motion for Summary Judgment*

Under Rule 56 of the Federal Rules of Civil Procedure, courts grant summary judgment

when there is no genuine dispute of material fact and the moving party is entitled to judgment as

---

[1] The Parents were not represented by counsel at the administrative hearing.

a matter of law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Haavistola v. Community Fire Co. of Rising Sun, Inc.*, 6 F.3d 211, 214 (4th Cir. 1993).  The court must "draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded a particular evidence." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520 (1991)(citation omitted).

Even though the evidence of the nonmoving party is to be believed and all justifiable inferences drawn in his favor, a party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences.  *See Deans v. CSX Transportation, Inc.*, 152 F.3d 326, 330-31(4th Cir. 1998); *Runnebaum v. Nationsbank of Md., N.A.*, 123 F.3d 156, 164 (4th Cir. 1997); *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985).  Accordingly, the claimant must proffer sufficient proof, in the form of admissible evidence, to carry the burden at trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Mitchell v. Data General Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993).  In the absence of contradictory evidence showing a genuine dispute as to a material fact, the moving party is entitled to judgment as a matter of law.  *See Celotex Corp.*, 477 U.S. at 324.

For the purposes of summary judgment, a genuine dispute exists if a reasonable jury could return a verdict for the nonmoving party.  *See Liberty Lobby*, 477 U.S. at 248.  While the nonmoving party must do more than merely raise some doubt as to the existence of a material fact, the moving party ultimately bears the burden of demonstrating the absence of all genuine issues of material fact.  *See Celotex Corp.,* 477 U.S. at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).  "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a

whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp.*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

**B.    IDEA**

The Court begins its analysis with a review of IDEA.  Under IDEA, all children with disabilities between the ages of 3 and 21 are assured a free appropriate public education.  20 U.S.C. § 1412(a)(1)(A).  "The goal of IDEA is that each child should receive an education appropriate to his or her unique needs, though this does not necessarily mean one that maximizes individual potential." *Sanger v. Montgomery County Bd. of Educ.*, 916 F. Supp. 518, 520 (D. Md. 1996).

In reviewing IDEA cases, the district court must determine (1) if the state or local educational authority complied with the procedures as delineated in the Act and (2) whether the IEP is reasonably calculated to enable the child to receive educational benefits.  *See Board of Educ. v. Rowley*, 458 U.S. 176, 207 (1982).  A district court must base its decision on the preponderance of the evidence, 20 U.S.C. § 1415(i)(2)(B)(iii), while giving due weight to the state administrative proceedings.  *See Rowley*, 458 U.S. at 206.  The hearing officer's findings of fact, which are entitled to *prima facie* correctness, are accorded due weight, and if the district court chooses not to follow those findings, it must explain why not.  *See Hartman v. Loudon County Bd. of Educ.*, 118 F.3d 996, 1000-01 (4th Cir. 1997), *cert. denied*, 522 U.S. 1046 (1998); *Doyle v. Arlington County School Bd.*, 953 F.2d 100, 105 (4th Cir. 1991).  If the two-fold inquiry is met, the State has complied with the Act and the courts can require nothing further.  *Rowley*, 458 U.S. at 207.  "[O]nce a procedurally proper IEP has been formulated, a reviewing court should be reluctant to second-guess the judgment of education professionals." *Tice v. Botetourt*

7

*County Sch. Bd.*, 908 F.2d 1200, 1207 (4th Cir. 1990).

The party challenging the state administrative proceeding bears the burden of proof on appeal. *See Barnett v. Fairfax County School Board*, 927 F.2d 146, 152 (4th Cir.), *cert. denied*, 502 U.S. 859 (1991); *Tice*, 908 F.2d at 1208-09 (4th Cir. 1990); *Spielberg v. Henrico County Public Schools*, 853 F.2d 256, 258 n.2 (4th Cir. 1988), *cert. denied*, 489 U.S. 1016 (1989).

## III. DISCUSSION

In their Motion for Summary Judgment, Plaintiffs acknowledge that "there are no material facts in dispute. . . ." Mem. P. & A. Supp. Pls.' Mot. Summ. J., at 26. Likewise Defendants declare that the material facts relevant to the resolution of this case are not in genuine dispute. Defs.' Mem. Supp. Mot. Summ. J., at 2. The court therefore adopts the following facts as found by the ALJ:

1.      The Child's date of birth is January 1, 1989. She has a condition of emotional disturbance and also has a learning disability.

2.      Before the 2002-2003 school year (the Child's eighth grade), the Child was not enrolled in MCPS public school. She attended several private schools.

3.      In the summer of 2002, the Parents contacted MCPS and requested educational services.

4.      An Individualized Education Program ("IEP") meeting was held on July 26, 2002. Among those present were George Moore, MCPS Placement Specialist, who chaired the meeting; the Child's Mother; the Child's Father; and the Child's therapist, Dr. Ellen Dye.

5.      The team determined that the Child needed 30 hours per week of special education services (all academic classroom instruction). The written IEP reflected this conclusion.

6.      The team determined that the least restrictive environment in which the Child could receive the necessary educational services was a separate special education day school. The team determined that a residential facility was not needed for educational reasons. The written IEP reflected these conclusions.

7.      The team discussed a possible educational placement at the school at RICA-Rockville.  This school is staffed by MCPS personnel but is located at a residential facility operated by the state Department of Health and Mental Hygiene ("DHMH").

8.      The MCPS staff informed the Parents that if the Child was accepted at RICA-Rockville, she could also be considered by the facility's staff for placement at the residential facility.

9.      The funding of the residential services was not discussed at the IEP meeting. MCPS members of the IEP team did not explain that if the Child received RICA residential services, the Parents might be responsible for the cost of those services.

10.     The Parents did not raise any objections to the written IEP at the IEP meeting.

11.     On August 5, 2002, Mr. Moore sent the Parents a copy of [the] July 26, 2002 IEP, with a cover letter.  The letter included the following:

>       The purpose of this letter is to notify you of the recommendations of the Individualized Education Program (IEP) team concerning your daughter, that were made at the meeting held on July 26, 2002.  The IEP provides more detailed information on the team's deliberations. . . . A referral will be made to [RICA-Rockville]. . . .  Referrals will also be made to the following nonpublic schools: The Frost School, Foundation School of Montgomery County, Lodge School, and Oakmont School. . .

>       You have the right to appeal any of the recommendations made by the IEP team. . . .  You have received a copy of the Procedural Safeguards Parental Rights brochure, which explains your rights and the steps to this process.  If you need assistance in interpreting this information in these brochures, please contact Ms. Stephenson, case manager, at [number listed].
>       (Parent Ex. #1).

12.     On September 3, 2002, the Child's Mother signed her initials on the IEP, after the statement, "IEP has been approved by Parent."  (MCPS Ex. #1, page 13 of 14).

13.     The Child was accepted by the RICA-Rockville school, and attended it in the 2002-2003 school year.

14.     The Child was accepted for admission to the DHMH RICA residential facility, and lived there in the 2002-2003 school year.

15.     In the fall of 2002, the Parents received a bill from DHMH for the cost of the Child's stay at the RICA residential facility.

16.     On March 10, 2003, the Parents filed a request for due process hearing.

ALJ's Decision, at 4-5.

### A.     *Accuracy of the Written IEP*

The Parents contend their daughter was denied a FAPE because the IEP team "agreed to refer [D.A.] to [RICA] for consideration of a residential program, but then wrote on her IEP that her needs could be met in a day-only program." Compl. ¶ 11. Dr. Ellen Dye, D.A.'s therapist, testified about the alleged discrepancy between the verbal discussions at the July 26, 2002 meeting and the written IEP.

> Q:  Do you feel that there was a disparity in what was verbally stated during the IEP meeting regarding placement recommendations and what was physically written on the IEP form?
>
> A:  I haven't seen that so I don't know what was written.  But I can tell you what was verbally stated.  Verbally stated was she needs a residential placement.  I was specifically asked in the meeting how I thought a day placement would go and I said at the time that I didn't even think her parents could physically get her into this school for a day program because at that point she had been going to school and refusing to get out of the car.  And then she had been calling her parents and they had to go and pick, even if they got her into the school somehow, there was one time I think she waited on the pavement for a while.  And there were many times the parents had to take off work and go and pick her up after she's been at school for an hour or two.
>
>   So, the issue of just sort of getting her into the car, getting her to the school, getting her from the car into the school facility and then keeping her there was what we've just been recently doing.  So, I know I said a day placement will not work.  And the committee meeting agreed with me and said yes, it's going to have to be a residential placement.  So, if it says on the form that a day placement was recommended, that's not true.  And in my notes it says the opposite.  So even if my recollection is wrong, I have it written right

there.

Hearing Tr., Vol. I, 45:5 - 46:7.  The Parents did not introduce Dr. Dye's notes as an exhibit

during the administrative hearing.

George Moore, who chaired the Central IEP meeting on July 26, 2002, has a different

recollection.

> A:     Was residential discussed?   Yes, it was, again, for
> noneducational purposes.  It was made very, very clear because of the
> issue of school avoidance, that team, the clinical team, could deal
> with that issue from a clinical point of view because that is a clinical
> issue.  It's not an educational issue, in my mind.
>
> I think it was made very, very clear that it was, in fact, a day
> placement but the option is certainly there for the clinical team that
> makes all decisions about RICA to determine, for noneducational
> reasons, if she requires the residential treatment component, which is
> very separate from the IEP process.

Hearing Tr., Vol. II, 204:9 - 20.

Mrs. A. testified that she understood MCPS was referring D.A. to RICA for the

residential program.

> Q:  So that even though MCPS indicated on its IEP special education
> day program, RICA and applied to five other day programs, your
> understanding was that it was recommending a residential program,
> an educational program?
>
> A:  Based on the verbalizations that were occurring, the discussions
> that were occurring, that is exactly what my understanding was.  In
> that as I stated before that when we were told to sign the form, when
> I queried my disagreement about what was on the form, I was told
> that's not a problem.  We need to do it this way because we are
> concerned even whether RICA was going to be able to start her at the
> beginning of the school year because it was already late.  It was late
> July.  School vacations, you know, staff taking vacations such that
> Billie Stephenson even hand delivered the paperwork to RICA on
> Monday.  The IEP meeting was a Friday afternoon.  Because they felt
> strongly that RICA and the RICA residential program which was

11

what was they voiced hope for [D.A.'s] placement into would be
what [D.A.] was accepted into.

Hearing Tr., Vol. I, 106:7 - 25.

Mr. Moore is unequivocal about what the IEP team decided.

The decision was to make a referral to RICA and let RICA determine
if she, in fact, would be appropriate for the day program and/or based
upon the interview with the parents, approved for the residential
treatment program.  But at no point did the IEP team recommend a
residential facility for [D.A.].

Hearing Tr., Vol. II, 201:15 - 20.

Page 14 of 14 of the July 26, 2002 IEP contains Part I entitled *Prior Notice*.  "Describe

any **requests for services** that parents wanted included in the IEP that were not considered

appropriate by the IEP team.  Indicate the IEP team's rationale and identify the basis for the

decision (e.g., assessment report, progress report, etc.)."  MCPS Ex. 1, Pg 14 of 14.  *No* requests

for services are listed.  Part I, *Prior Notice*, is marked "Non Applicable."  Mr. Moore testified

about this matter.

Q:   You stated that residence was discussed for noneducational
purposes.  Did the parents voice disagreements with this?

A:  Well, again, this is where the confusion comes in, because page
14 of the IEP —

. . .

The Witness:   On page 14 of [MCPS Exhibit 1], parent's objections
are noted there.  When I asked the question, there was no objection
so I checked not applicable there.

. . .

Q:  Okay.  Did the parents voice any verbal disagreement regarding
the statement that residential was not educationally based?

12

> A:  I heard no disagreement about that.  If I had heard, I would put it on page 14, I would probably note it, which is my legal responsibility.

Hearing Tr., Vol. II, 217:13 - 17, 21 - 23, 218:13 - 18.

The Parents did not initial their approval of the IEP on July 26, 2002.  Mrs. A. did however sign a document authorizing MCPS to send D.A.'s school records, reports and observations to the nonpublic special education day schools the IEP team suggested for placement.  *See* MCPS Ex. 1 (MCPS Form 336-32).

The Parents received the written IEP on or after August 5, 2002.  The Parents knew or should have known that the IEP team recommended a separate special education day school as the Least Restrictive Environment, as opposed to a residential facility.  On page 9 of 14 of the IEP the *No* box is checked next to "a residential facility: placement as a residential student for educational reasons."  The *Yes* box is checked next to "a separate special education day school: includes student who receives 50% or more of their instruction in a separate facility as a day student."  Moreover, in the August 5, 2002 letter from Mr. Moore to the Parents, Mr. Moore writes:

> A referral will be made to The John L. Gildner Regional Institute for Children and Adolescents.  Please contact Ms. Cindy Baker, admissions coordinator, by calling [number listed], to schedule an interview.  Referrals will also be made to the following nonpublic schools: The Frost School, Foundation School of Montgomery County, Lodge School, and Oakmont School.  Staff from these schools will contact you to schedule interviews.

Parent Ex. 1. These are the separate special education day schools that the IEP team identified as schools that could provide the services D.A. needed.  *See* MCPS Ex. 1 (Page 9 of 14; MCPS Form 336-32).

In the August 5, 2002 letter, Mr. Moore states unequivocally, "[y]ou have the right to appeal any of the recommendations made by the IEP team.  Any other options that were considered but rejected by the IEP team are noted on the *Prior Notice* section of the enclosed IEP team meeting documents.  You have received a copy of the <u>Procedural Safeguards Parental Rights</u> brochure, which explains your rights and the steps to this process."  Parent Ex. 1.  This August 5,2002 letter satisfies the "prior notice requirements" of 20 U.S.C. § 1415(c) and the court rejects the Plaintiffs' contention that the Parents were not fully advised of their rights.

If the Parents knew, upon receiving the written IEP, that the IEP did not conform with the discussions on July 26, 2002, it is inexplicable why the Parents did not appeal the IEP team's recommendation — placement at a separate special education day school.  An explanation is gleaned from Mrs. A.'s testimony.

> As [D.A.'s] mom and being part of the IEP team, I came out of the IEP meeting feeling very comfortable, feeling like, hey, we're all in agreement. . . .  Where said, you know everyone really looks like that RICA would be the right placement and ***all that needs to be determined is whether RICA determines day school or residential***.

Hearing Tr., Vol. I, 94:17 - 19, 22 - 25 (emphasis added).

This testimony reveals the Parents knew the IEP "team decision was a referral to RICA. Since it is not a Montgomery County public school, the central IEP team, or the individualized education program team at the central level, cannot place a child at RICA.  The team can make the referral for a clinical interview at RICA."  Hearing Tr., Vol. II, 194:21 - 195:1.  Further, Mrs. A.'s acknowledgment that MCPS referred D.A.'s case to RICA, which, in turn, would decide whether to admit D.A., and if so, either to the day school or the residential facility, contradicts Mrs. A.'s testimony that MCPS recommended RICA's residential program.

Finally, the Parents did not approve the IEP on the day the Parents met with MCPS officials. Mrs. A. initialed her approval of the IEP on September 3, 2002, the same day D.A.'s residency at RICA began. Mrs. A. initialed her approval below Part IV: Placement, identifying the program as a separate special education day school. *See* MCPS Ex. 1 (Pg 13 of 14). "[The Parents] did not understand the implications of such a signature — that they believed that they were agreeing to RICA's consideration of a residential placement for their daughter." Docket No. 43, at 5. Although the Location of Services was modified on Page 13 of 14 from "Explore RICA & Non Public" to "RICA" presumably on September 3, 2002 when Mrs. A. approved the IEP, *compare* MCPS Ex. 1 (Pg 13 of 14) *with* MCPS Ex. 1 (Pg 9 of 14), the placement program remained the same — separate special education day school.

> This is where, [the notice from RICA admitting D.A. to its residential program] must supersede what was written on the IEP of a special ed day program because RICA themselves, their admission board which consisted of state and County staff, has said she's coming in as a residential student. So yeah, that's her placement. That's her provision of FAPE according to COMAR.

Hearing Tr., Vol. I, 96:17 - 23 (Testimony of Mrs. A.).

Approving the IEP once D.A. was enrolled in RICA's residential program did not *transform* the IEP's Least Restrictive Environment of a separate special education day school *to* a residential facility.

MCPS complied with the procedures delineated in the Act. It is undisputed that D.A. received educational benefit while enrolled at RICA. *See* Hearing Tr., Vol. I, 101:4 - 7; 119:17 - 20. The ALJ properly found MCPS did not violate any procedural rights of Plaintiffs under the IDEA. D.A. was not denied a FAPE on this basis.

**B.      *Potential Financial Responsibility for Residential Placement at RICA***

It is undisputed that the IEP team did not advise the Parents of the potential financial

costs if D.A. was admitted into RICA for residential treatment.  "The funding of the residential

services was not discussed at the IEP meeting.  MCPS members of the IEP team did not explain

that if the Child received RICA residential services, the Parents might be responsible for the cost

of those services."  ALJ Decision, at 5.  The Parents apparently *presumed* any placement at

RICA was at no cost to them, since RICA is a public school.  Dr. Dye provided some insight on

this matter.

> The parents specifically asked the question if you put her in a private placement, how would that be funded?  And they were told that Montgomery County Public Schools contracts with these private placements and they would pay for that.  There would be no cost to the family.  That was not asked about RICA specifically, but it was asked about some of the private placements that were offered.  So the parents were concerned about funding. . . .

> RICA was presented as a public placement.  It was presented as a joint venture between Montgomery County and the State of Maryland.  My assumption as a professional attending the meeting was that that meant, I guess the state provided some kind of funding to the school. . . .

> . . .

> And I think the parents, I can testify [they] were also looking at private alternatives for residential boarding schools at that time.  And one of the key determining factors in picking RICA was the cost factor because they had already depleted any, most of their additional financial resources.

Hearing Tr., Vol. I, 39:8 - 15, 18 - 22, 40:20 - 25.

Presuming that a placement at RICA would be at no cost is not unreasonable since RICA

is a public institution.  Presuming MCPS would pay for D.A.'s residential enrollment at RICA

when MCPS officials determined D.A.'s Least Restrictive Environment is a separate special

education day school however is not reasonable.  The Parents were well aware that the IEP team

found D.A's needs could be met at a separate special education day school.

   The Parents contend MCPS officials failed to disclose the potential costs of the RICA

residential program and thus the Parents' consent was not informed.  In essence the Parents

claim they were deceived.  Contrary to the Parents' assertions, they were not deceived.  They

wanted more services for their daughter than what MCPS officials determined that she needed.

> I know that MCPS does pay for some residential programs, a few, but
> they do.  And I do feel that that needed to be the most appropriate
> placement for [D.A.] given that everything that could have been done
> on an outpatient basis and special schooling had been tried and
> unfortunately with negative results including hospitalization.  And
> that COMAR regulations for special ed also do say that outside of
> school hours is still part, an[d] be part of the educational process and
> needs to be taken into consideration for some students.  And I think
> that [D.A.] falls into that.

Hearing Tr., Vol. I, 100:19 - 101:3 (Testimony of Mrs. A.).

   Since the IEP team did not identify a residential facility as D.A.'s Least Restrictive

Environment, the IEP team had no obligation to discuss the potential financial costs.[2]  Second,

the residential program at RICA falls under the auspices of the Department of Health and Mental

---

[2] A: It is my understanding, again, this is not information that the IEP team has jurisdiction over or discusses, but basically, my knowledge of having worked at RICA, having shared meetings with RICA, having talked to the State Department about this and other people, families are advised up front that they are going to be billed for the treatment portion, that their insurance does not cover it.

Q: Does MCPS, and you've stated this but just to make it crystal clear, does MCPS have anything to do with the funding or decision-making with regard to the residential treatment component of a student it places in a day setting?

A: It has none.

Hearing Tr., Vol. II, 206:11 - 24 (Testimony of Mr. Moore).

Hygiene ("DHMH"), *not* MCPS.  Third, if there is a fee for the residential program, the

residential tuition is charged by DHMD.  *See* Hearing Tr., Vol. I, 125:14 - 20.  Fourth, the bill

the Parents received in the Fall 2002 was not issued by MCPS.  *See* Hearing Tr., Vol. I, 84:23 -

85:6.   Finally, Plaintiffs cite 34 C.F.R. § 300.142 for the proposition that when a school system

refers a student to an outside public agency for special education and that outside public agency

fails to pay for the special education, then the school system shall pay for the special education.

The Plaintiffs overlook the fact that the IEP team referred D.A. to RICA for a separate special

education day school, ***not a residential facility***, and MCPS paid any costs associated with the

RICA day school program.  The IEP team did not determine D.A.'s needs could be met only by a

residential facility,[3] did not refer D.A. to the RICA residential program and thus any costs

associated with the RICA residential program are not borne by MCPS.

MCPS[4] bears no responsibility for the $571 per day residency cost charged by DHMH.

This expense is the responsibility of the Parents who, knowing their daughter's IEP identified *a

separate special education day school*, nonetheless willingly accepted admission to the RICA

residential program.  Any dispute about the inappropriateness of this cost lies with DHMH.[5]

For the foregoing reasons, an order will be separately entered awarding summary

---

[3] If MCPS officials had determined D.A.'s Least Restrictive Environment is a residential facility, it is undisputed that MCPS would have had to pay for the residential program.  "If placement in a public or private residential program is necessary to provide special education and related services to a child with a disability, the program, including non-medical care and room and board, must be at no cost to the parents of the child."  34 C.F.R. § 300.302.

[4] Although the court finds MCPS is not responsible for the cost of the residential program, henceforth it would be prudent for MCPS to explain in writing to parents how RICA is structured and to alert parents of the potential financial cost for enrollment in the residential program when MCPS determines that a Child's Least Restrictive Environment *is not* a residential facility.

[5] According to Defendants the parents filed an appeal with the Department of Health and Mental Hygiene regarding the funding issue and their request for relief was denied.  Mem. Supp. Defs.' Mot. Summ. J., at 16.

judgment in favor of Defendants.


September 22, 2005                                    /s/
_____          _____
        Date                              WILLIAM CONNELLY
                                   UNITED STATES MAGISTRATE JUDGE